UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                    :

UNITED STATES OF AMERICA     :
                                      :

           -v.-           :        06 Cr. 309 (GEL)
                                      :

WALID ALY,                        :        **OPINION AND ORDER**
                                      :

                         <u>Defendant</u>.      :
                                      :
-------------------------------------------------------------x

Christopher L. Lavigne, Assistant United States
Attorney (Michael J. Garcia, United States Attorney
for the Southern District of New York), <u>for the United
States of America</u>.

B. Alan Seidler, Esq., New York, NY, <u>for Defendant</u>.


GERARD E. LYNCH, <u>District Judge</u>:

      Defendant Walid Aly moves for a second time to withdraw his plea of guilty to charges

of making false statements to a Government agency and illegal reentry after deportation.  The

motion will be denied.

## BACKGROUND

### I.   <u>Indictment and Guilty Plea</u>

      On April 4, 2006, the Grand Jury charged Walid Aly with two crimes: illegally reentering

the United States after deportation in violation of 8 U.S.C. § 1326(a), and making false

statements to a federal officer in violation of 18 U.S.C. § 1001.  On May 10, 2006, Aly proffered

a guilty plea before the Honorable Andrew J. Peck, United States Magistrate Judge.  At the plea

proceeding, Aly stated under oath that he is not a United States citizen, that he was deported

from the United States in 2005, and that he returned to the United States during or before

January 2006 without seeking or obtaining permission from the relevant Government authorities. (5/10/06 Tr. 15.)  He further admitted that on June 8, 2005, he falsely told agents of the United States Bureau of Immigration and Customs Enforcement in an interview at Rikers Island that he and his wife then lived together, when in fact they did not.  (Id. 15-16.)

Sentencing was scheduled for June 16, 2006.  The sentencing was expedited at defendant's request, since defendant hoped that the sentencing guidelines would permit a sentence of time served since his arrest. (6/16/06 Tr. 3.)  This Court entered an order accepting the guilty plea on June 14, 2006.

## II.    Changes of Direction

On the scheduled sentencing day, however, defense counsel informed the Court that Aly wanted to withdraw his plea.  (Id. 2.)  The Court gave defendant two weeks to file a motion to that effect.  No motion was filed, however.  Instead, defense counsel advised the Court that Aly had changed his mind again, was prepared to proceed to sentence, and did not wish to withdraw his plea.  (See 7/5/06 Tr. 2.)  Accordingly, sentencing was rescheduled for July 5, 2006.

On that occasion, however, Aly indicated that he had had another change of heart. Defense counsel advised the Court that although Aly had "decided at some point last week that he did not want to file a motion to rescind his plea and wanted to simply go forward with the sentencing," immediately before the scheduled sentencing Aly advised that he again would like to rescind his plea, and furthermore that he wanted a new lawyer.  (Id. 3.)  The Court accommodated Aly's request, relieving his lawyer and appointing new counsel.

2

### III.   <u>First Motion to Withdraw Plea</u>

On August 1, 2006, through his new counsel, Aly finally filed a motion to withdraw his plea.  His five-page memorandum of law argued that Aly's plea had not been voluntary, because he was "pressured by his [then attorney] to quickly enter a plea," he was in pain from kidney stones at the time the plea was entered, and he was not advised that he could challenge the underlying deportation order in the criminal proceeding.  (7/31/06 D. Mem. 4-5.)  In reply papers filed after the Government opposed the motion, defendant for the first time set forth his defense to the illegal reentry charge, arguing that his initial deportation was unlawful because he had never received notice that his prior application for permanent residence on the basis of marriage to a United States citizen had been denied, that the denial did not apply to him in any case because the notice of decision bore his name but an incorrect "A" number, and that the denial was erroneous.  (Letter of Edward D. Wilford, Esq., to the Court, dated August 30, 2006, at 1-2.) Aly made no attempt to assert a defense to the second count of the indictment, which charged him with falsely stating, in an interview with an immigration investigator, that he continued to live with the woman who had applied for permanent residence for him.

### IV.   <u>Denial of the First Motion</u>

The Court heard argument on the motion on September 6, 2006.  At the conclusion of the argument, the Court denied the motion in a 15-page oral opinion.  (9/6/06 Tr. 20-35.)  The Court noted that Aly made no intelligible claim of innocence of the false statement charge.  (<u>Id</u>. 22.) With respect to the illegal reentry charge, the Court first noted that "to the extent Mr. Aly claims that he simply didn't understand or was ill at the time of the plea or just in general that he didn't really know what he was doing, the transcript of the plea allocution completely and absolutely

refutes that claim." (Id.)  As the Court stated, "Judge Peck asked Mr. Aly specifically about his health and about his satisfaction with counsel, and Mr. Aly expressed no doubts or hesitation about either, but said he was satisfied with counsel and physically and mentally fit to proceed." (Id. 23; see 5/10/06 Tr. 4, 6-7.)  When Aly exhibited a momentary hesitation about entering the plea, Judge Peck "addressed Mr. Aly directly, told him that if he had any doubts the matter could be postponed to allow him to think further about his decision, emphasized that the decision was his, and that he should feel under no pressure, and reminded him that if he went ahead the decision was irrevocable.  Judge Peck specifically stated that, 'I don't want anyone to be twisting your arm.  I don't want you to later come back to court and say somebody twisted your arm or was forcing you to make a bad decision or was convincing you to do something that you didn't really want to do.'" (9/6/06 Tr. 23-24, citing 5/10/06 Tr. 13-14.)  Although the Magistrate Judge twice offered Aly additional time to think about it, and emphasized the solemnity and irrevocability of a decision to go forward with the plea, Aly insisted that he wanted to go ahead. (Id. 24, citing 5/10/06 Tr. 14.)  The Court concluded that Judge Peck's careful inquiry "put to bed forever" Aly's claims of having been coerced.  (Id. 25.)

With respect to Aly's claim of ineffective assistance, the Court, while noting its respect for defendant's prior counsel, assumed arguendo that Aly had not been adequately advised of the possibility of raising a collateral challenge to the underlying deportation order.  (Id.)  Noting, however, that to establish ineffective assistance of counsel defendant would have to show prejudice, the Court emphasized that this factor overlapped with the consideration of whether defendant had a viable claim of legal innocence – in the context of defendant's motion, whether he did indeed have a viable challenge to the deportation order.  (Id. 25-26.)  "But despite having

4

been given every opportunity to brief the matter, [and] a further opportunity to argue here today as well, the defendant has not presented any basis for believing that he has such a motion, and in the absence of such a viable motion there is neither a viable claim of legal innocence nor a basis for believing that Mr. Aly was poorly advised or was prejudiced by a failure to address this avenue of defense." (Id. 26.)

As the Court noted, defense counsel conceded that in his papers on the motion to withdraw the plea he had in effect made the motion to dismiss the reentry count that he would have made had the motion to withdraw been granted.  (Id. 26; see id. 17.)  Having reviewed the entire record of the deportation proceedings and heard defendant's motion, the Court concluded that the motion would have to be denied, and that Aly's claim of legal innocence was without merit.  (Id. 26)

Whatever Aly's potential objections to the handling of his green card application, the Court ruled, the question in this case is whether he has a valid challenge to his *deportation proceeding*.  In order to collaterally challenge a deportation order in a prosecution for illegal reentry, a defendant must satisfy the criteria set forth in 8 U.S.C. § 1326(d), which effectively codifies the conditions set forth for such a challenge in United States v. Mendoza-Lopez, 481 U.S. 828, 837-42 (1987).  See United States. v. Scott, 394 F.3d 111, 116 (2d Cir. 2005).  The defendant must show (1) that he has exhausted any administrative remedies that may have been available to him to seek relief against the deportation order; (2) that the deportation proceeding in which the order was issued improperly deprived him of an opportunity for judicial review; and (3) that the entry of the order was fundamentally unfair.  8 U.S.C. § 1326(d), cited at 9/6/06 Tr. 30.  Aly, the Court ruled, could satisfy none of these conditions.

5

Far from exhausting his administrative remedies, Aly specifically declined to pursue the administrative remedies of which he was specifically advised.  Represented by counsel at his immigration hearing, Aly conceded deportability.  (9/6/06 Tr. 29; see Imm. Tr. 22-23.)  Upon being advised by the immigration judge that he had a right to appeal, Aly "initially asserted a desire to waive appeal, but after the very persistent and diligent immigration judge explained yet again the significance of waiving appellate rights and explained that Mr. Aly could reserve a right to appeal and take time to think it over and could still waive appeal and seek prompt removal if he chose to do that at a later time," Aly decided not to waive appeal at the hearing.  (9/6/06 Tr. 29; see Imm. Tr. 42.)  However, the very next day Aly's attorney advised the immigration judge in writing that Aly had changed his mind again and wanted to waive his appeal.  (8/16/06 Lavigne Decl. Ex. E.)

The record thus demonstrated that far from being deprived of his right to review of the results of the removal hearing, Aly was fully advised of his right to seek such review.  In fact, the immigration judge affirmatively declined to accept Aly's initial effort to waive his appeal rights, and virtually compelled him to take additional time to consider whether to take such a step.  After taking advantage of that time, and having further consulted his attorney, Aly "consciously chose with the advice of counsel to waive" his administrative remedies.  (9/6/06 Tr. 31.)

Finally, the Court ruled that Aly could not show that the deportation order was fundamentally unfair.  Whatever the merits of Aly's objections to the earlier denial of his application for permanent residence, it is undisputed that at the time of his removal hearing Aly had no legal right to remain in the United States.  His parole status and work authorization both

had expired in 2004, and neither at the immigration hearing nor at any time since has Aly made

any claim that he was legally authorized to remain in the United States or that he was not subject

to removal at the time of the hearing in August 2005.  (Id. 28-29, 31-32.)  "The defendant has

not presented this [C]ourt with any reason to believe that under immigration law or procedure he

had any right at that time to re-raise his green card denial, but even if he did[,] with the advice of

counsel he withdrew any effort to pursue that claim further."  (Id. 32.)

The Court thus concluded that Aly's proffered defense was without merit, and that he

therefore had suffered no prejudice from any failure on the part of his original defense attorney

to advance or advise him of that defense.  Accordingly, the motion to withdraw the guilty plea

was denied.

## V.    Second Motion to Withdraw Plea

Aly immediately returned to the fray.  On September 10, 2006, he sent a pro se letter to

the Court, arguing that he had in fact instructed his first attorney to seek to withdraw his plea not

on the morning of the scheduled sentencing on June 16, when the issue was first raised with the

Court, but on May 14, within days of proffering the plea before Judge Peck.  The difference was

potentially significant; since the Court did not receive a transcript of the allocution before the

Magistrate Judge and enter an order accepting the plea until June 14, had counsel immediately

acted on Aly's purported instruction, defendant's application to withdraw the plea would have

been filed before the plea had been accepted.  Under Federal Rule of Criminal Procedure

11(d)(1), a defendant's guilty plea may be withdrawn "before the court accepts the plea, for any

reason or no reason," while under Rule 11(d)(2) an application to withdraw a plea after

acceptance requires the defendant to "show a fair and just reason for requesting the

withdrawal."[1]

Since Aly's first motion had been styled a motion to withdraw his plea, and since the Court had not been notified of any desire on Aly's part to rescind his plea of guilty until after the plea had been accepted, the Court had addressed the motion under the standard provided by Rule 11(d)(2). Aly's letter raised the possibility that his attorney had been derelict not in advising him to enter a plea, but in failing to act on his client's wish to withdraw the plea at a time when he arguably could have done so as a matter of right. Accordingly, on September 18, 2006, the Court entered an order directing both parties to address the significance of Aly's new assertion.

The parties made submissions on October 3, 2006, with the Government arguing that Aly's flip-flops after May 14 had waived any right he presumably had to withdraw his plea as of right, and Aly arguing that he should be permitted to withdraw his plea no matter what standard was applied. (Letter of AUSA Christopher L. Lavigne, to the Court, dated Oct.3, 2006, at 6-8; Letter of Edward D. Wilford, Esq., to the Court, dated Oct. 3, 2006, at 1-3.) Two days later, Aly's present retained attorney[2] entered an appearance on his behalf, and shortly thereafter submitted yet another letter-brief, arguing that Aly's lawyer should have sought immediate as-of-right withdrawal of the guilty plea, and reiterating his claims regarding the illegal reentry

---

[1] While the Second Circuit has not addressed the precise circumstance of an effort to withdraw a plea fully allocuted before a magistrate judge but not yet accepted by the district court, see United States v. Elfgeeh, No. 03 Cr. 133 (CPS), 2004 WL 3767299, at *2 (E.D.N.Y. Apr. 13, 2004), that Court has in other contexts read Rule 11(d)(1) broadly as providing that "a defendant may, as a matter of right, withdraw his guilty plea before it has been accepted by the district court." United States v. Lopez, 385 F.3d 245, 250 (2d Cir. 2004).

[2] On January 18, 2007, the Court received a letter from that attorney indicating that Aly had fired him too, following disagreements about strategy. The Court has not yet confirmed this action with the defendant or relieved counsel.

charge (but still making no argument as to the false-statement offense).  (Letter of B. Alan Seidler, Esq., to the Court, dated Oct. 17, 2006, at 1-2.)

After considering these submissions, the Court determined that an evidentiary hearing should be held to develop the facts regarding Aly's interactions with his original attorney.  At the hearing, held on November 9 and 13, 2006, the Court heard testimony from both the attorney, David Patton, Esq., and from Aly.  Defendant submitted a post-hearing letter-brief on December 4, 2006, and the Government responded on December 19, 2006.  The matter is once again ripe for decision.

## FINDINGS OF FACT

I.   **Credibility Determinations**

1.   In determining the facts, the Court relies primarily on documentary evidence and on the testimony of attorney Patton.  Patton was a straightforward witness, who testified with care and honesty.  He presented with surprisingly little defensiveness, given his former client's accusations.  If he had any bias in the matter, it appeared to be in favor of his former client, in the sense that he appeared quite careful to avoid harming Aly if he could.  He was precise about what he remembered and what he could not remember clearly, and to the extent his testimony conflicted with objective evidence on matters of detail, the contradictions appeared to be the natural result of memory lapses in remembering the details of events some months previous in the life of a busy public defender.

2.   The Court can place no reliance whatsoever on the testimony of defendant Aly.  It was perfectly apparent that Aly was prepared to tell any story at any time, depending on what might benefit him at that particular moment.  This utter lack of truthfulness is demonstrated by the

frequent and flagrant contradictions in his various accounts of events central to this case on different occasions.  For example:

    a. In 2001, Aly and his purported wife Sarah Pitera, a United States citizen, submitted papers seeking permanent residence for Aly in the United States.  (11/9/06 Tr. 70-71.)  At his removal hearing in 2004, he told the immigration judge that he and his wife were already separated.  (Id. 67.)  Interviewed by a law enforcement agent in Rikers Island in June 2005, he advised that he and his wife were still living together.  (Id. 27-28.)  In January 2006 he told a New York City police officer that the marriage was fraudulent.  (Id. 26, 70; see also 5/10/06 Tr. 15.)  In March 2006, he told an immigration agent that he had paid someone $2,000 to arrange a fraudulent marriage to help him get a green card.  (11/9/06 Tr. 68; GX 7.)  At his plea allocution, he testified under oath that his 2005 statement about living with his wife was a lie.  (11/9/06 Tr. 15.)  At the hearing on the instant motion, he testified, again under oath, that his 2005 statement was true, and that his 2006 statement and plea allocution were false.  (Id. 27-28.)  During the hearing, he at one point testified at considerable length about the details of his March 2006 statement (id. 67-70), while at another point he said he did not remember what he said, but that whatever it was had been made up (id. 51).

    b. At his plea allocution, he swore that he had not been threatened or coerced to plead guilty, and that he had discussed the immigration consequences of his plea with Patton.  (Id. 11-12.)  According to an affirmation submitted with his first motion to withdraw his plea, Aly had been "placed under enormous pressure" by Patton to plead guilty, and agreed to plead guilty only because of the "high pressure plea tactics employed by [Patton]."  (8/1/06 Aly Aff. ¶¶ 5, 7.)  At the hearing on the instant motion, he testified that he had never seen or reviewed the

affirmation filed with his initial motion.  (11/9/06 Tr. 58.)[3]  He claimed at the hearing that he was

unaware of the statutory maximum sentence at the time of the plea (id. 38), although he was

clearly advised of that fact by the Magistrate Judge at the time of the allocution.  (5/10/06 Tr. 6.)

       c.  Aly's demeanor confirmed his untrustworthiness.  He was defensive, truculent,

and evasive, and had to be admonished frequently to answer the questions that were asked on

cross-examination.  (See, e.g., 11/9/06 Tr. 29, 36, 37, 50, 53, 68.)  On several occasions, he

attempted to explain errors or contradictions by citing his difficulties with English (see, e.g., id.

67, 72); however, he demonstrated on the witness stand that he spoke English fluently enough to

understand complex questions and bandy answers with his examiner.  When asked detailed

questions about his wife and child, including such questions as his child's birthday and his own

whereabouts at the time of his child's birth, his hesitations made it apparent to the Court that he

was perplexed and was making up details as he went along.  (See id. 78-79.)

       d.  Indeed, with respect to the birthday of the child, he was led into further

contradictions.  He testified that the child was born in Egypt on December 8, 2003.  (Id. 79.)

Asked where he was at that time, he first said he was in the United States, then that he too had

been in Egypt.  (Id.)  Apart from the implausibility of a father's having to puzzle out whether he

was or was not in the same country as his wife when she gave birth to his child, the record

reflects that Aly was paroled into the United States in January 2003 to pursue his green card

application.  (See 8/16/06 Lavigne Decl. Ex. J.)  There is no documentary evidence in the record

that Aly ever left the United States again after January 2003, or was anywhere other than in the

---

[3] It should be noted that the filed version of this affirmation does not in fact bear Aly's
signature.

United States in December 2003.  It seems unlikely that an American citizen not of apparent

Middle Eastern origin would travel to Egypt to have her baby while her Egyptian husband

remained in the United States; it would be convenient, however, for someone who knew that no

birth record for a purported child could be found in the United States to claim that a child was

born in another country.

        e.  Finally, Aly's claims on several points were implausible.  For example, he

testified that he made up the story about arranging a fraudulent marriage in order to satisfy

agents' demands, reinforced by a variety of threats, that he tell them about terrorist activities

(11/9/06 Tr. 55-56, 69-70), notwithstanding the fact that his story had nothing to do with

terrorism.  He testified that although his family remained in touch with he wife, who he claimed

is in London, working in her father's import/export business, he had not spoken to her since his

arrest, and she did not know that he was in trouble.  (Id. 72-74.)  He claimed that he would not

seek to have her testify to the bona fides of the marriage, because it would "break her heart" to

learn that he was in jail (id. 73), notwithstanding the fact that the legitimacy of the marriage is

central to his purported defense, and that his difficulties are immigration related.  (Apparently,

his wife is less upset not to hear from him for months than she would be to learn that he was in

jail based on charges of falsely vouching for his marriage.)  In any event, through all of Aly's

vicissitudes, from his removal hearing through the present criminal case, Sara Pitera has never

appeared or testified.[4]

---

[4] After the hearing, and well after the record was closed, Aly submitted through counsel
what purported to be a card from his wife in London.  Counsel did not seek to reopen the record
to offer the note into evidence, preferring simply to convey it to the Court as a document that
"defendant Aly informs me [was] sent to Mr. Aly by his wife Sara Aly in London."  (Letter of B.
Alan Seidler, Esq., to the Court, dated December 12, 2006.)  The card is not authenticated in any

## II.   **Aly's Immigration History**

3.   Aly, a citizen of Egypt, entered the United States in 2000.  He purportedly contracted a marriage with one Sara Pitera in 2001, and on the basis of that marriage his wife applied for permanent residence status in the United States on his behalf on March 29, 2001.  Aly has since advised investigators on two separate occasions that this marriage was fraudulent, and that he paid money to another individual in order to arrange a marriage to an American citizen who would apply for a green card for him.

4.   On April 2, 2002, the Immigration and Naturalization Service sent a notice to Aly requiring that he and his wife appear for an interview on June 24, 2002.  (GX 3.)  Neither Aly nor his wife appeared.  Instead, on April 25, he sought and received a document permitting him to leave the country and be permitted reentry on parole at any time within a year.  (Id.)  On May 5, 2002, he also apparently notified the INS that he would not be able to attend the appointment

---

way.  There is no basis for concluding that the woman who sent it is the same Sara Pitera who purportedly married Aly in the United States, or that she is married to Aly at all.  The card contains two photographs.  Counsel represents that the photos are of "Walid and Sara, and Sara with their child."  (Id.)  However, the writing on the photos describes them as depicting "me and your son Willy" and "your sister Hala with Adam."  (Id., enclosure.)  True to form, after the Government pointed out some of these discrepancies, including the fact that there was no actual letter from a wife who purportedly had not seen her husband in years, Aly wrote the Court directly, enclosing a copy of a note from Sara that his lawyer "forgot to send," and arguing that "Willy" refers to him, rather than to his son.  (Letter of Walid Aly, to the Court, dated December 28, 2006.)  Needless to say, none of these unsworn and undocumented materials, submitted after the record was closed and the Government no longer had the opportunity to cross-examine Aly about them, is of any evidentiary value whatsoever.  It is entirely possible, of course, though not particularly relevant to any issue before the Court, that Aly has a wife and child outside the United States.  What is relevant is whether that wife is Sara Pitera, the American citizen who petitioned for his green card.  Nothing in any document submitted by Aly after the hearing even purports to assert that she is.

13

because he had to "travel to see" his father, who "is sick" with "a serious heart condition." (Id.)[5]

5. The record does not clearly disclose when Aly left the country or where he went.  He returned to the United States on January 2003, and was paroled into the country in order to pursue his application for permanent residence.  The parole was scheduled to expire by its own terms on Jan. 4, 2004. (GX 3.)  In August 2003, he appears to have received permission to work in the United States, an authorization that also expired in August 2004.  (Id.)[6]  On January 13, 2003, the INS notified Aly that his application had been denied because Aly failed to appear for the interview.  (Id.)  Aly asserts that he never received the notice that his application had been denied, and took no further action to pursue the application.  (11/9/06 Tr. 19.)

6. By August 2004, both Ali's parole status and his work authorization had lapsed.  By that date at the latest, he was out of status and had no legal right to remain in the United States.  Removal proceedings were instituted against him on July 20, 2005.

7. On August 5, 2005, a removal hearing was held, at which Aly was represented by counsel.  He was fully advised by the Immigration Judge of the charges against him and of his right to a hearing on those charges.  (Imm. Tr. 1-5.)  Counsel requested a week's adjournment to permit additional preparation for the hearing, which was granted.  (Id. 6, 13.)

---

[5] Aly has submitted to the Court his father's death certificate.  (GX 3.)  This document reports that Abdelfatah Aly Ahmad died in Brooklyn on January 12, 2004, and states that he was a resident of Brooklyn at the time of his death.  (Id.)  Aly has not explained when his father came to the United States or why he had to travel outside the country to visit his father in 2002 if his father lived in Brooklyn.

[6] Aly appears to have submitted a further application for employment authorization in November 2004.  (GX 3.)  There is no indication in the record of whether that application was ever acted on.

8.   The hearing was resumed on August 18, 2005.  On that date, Aly admitted the truth of the allegations against him, specifically that he was "an immigrant without proper visa . . . or documents."  (Id. 23.)  Because Aly had been paroled into the United States, he was treated as an arriving alien, and he was not entitled to apply for voluntary departure.  (Id. 24.)  Following a discussion of whether Aly could or should be permitted to withdraw any pending application for admission, counsel indicated that Aly would instead seek a final order of removal.  (Id. 29.)

9.   Aly then spoke directly to the Immigration Judge, claiming that he had "paid the violation which is $1000 to become legal."  (Id. 30.)  In direct colloquy with Aly, the Immigration Judge pointed out that what Aly had paid was "the fee you pay to apply for a green card even though you had violated your immigration status in certain ways."  (Id. 31.)  He then advised that Aly's application for a green card "is over.  It's been over for two and a half years. You've been in the United States without a legal basis for it.  And now it's time for you to leave the country."  (Id.)  In the course of that dialogue, the Immigration Judge asked where was "the lady Sarah Ali who petitioned for you?"  (Id. 30.)  Aly responded, "She's . . . not here.  We have – like – we already separated."  (Id.)

10.   The Immigration Judge then made his ruling.  He noted that Aly had been paroled into the United States in January 2003 "due to his pending application for permanent residence. That application has been denied.  There's nothing to show there's any appeal pending.  [Aly's] . . . valid parole into the United States has already expired.  The court does find, as admitted by [Aly's] counsel, that he is subject to removal as charged."  (Id. 36-37.)  The IJ also denied Aly's application "for the chance to leave the United States on [an] analogous basis to voluntary departure by withdrawing his application for admission to the United States," because of Aly's

15

"[criminal] record, the fact that [he] apparently is still hoping to live in the United States, and the desirability of giving [him] a clear order of removal so that he will understand that his permission to be in the United States has concluded."  (Id. 37-38.)

11.   Initially, Aly's attorney reserved a right to appeal, and the IJ specifically and clearly advised Aly of his right to appeal.  (Id. 38-40.)  Aly, however, advised his attorney in the IJ's presence that he did not want to appeal.  (Id. 40.)  The IJ did not rest content with that waiver, but pointed out to Aly that he could delay a decision on whether to appeal by reserving the right at that time, and waiving the appeal later, while a waiver on the spot was irrevocable.  (Id. 41-42.)  Nevertheless, Aly through counsel waived his right to appeal the very next day.  (8/16/06 Lavigne Decl. Ex. E.)

12.   Aly was then removed from the United States on September 23, 2005.  He returned, however, without permission, sometime before January 26, 2006, when he was arrested in Queens for driving under the influence of alcohol.

## III.   <u>The Present Proceedings</u>

13.   Aly was arrested again in February 2006, for violation of an order of protection, following a domestic dispute with his girlfriend, one Martha Domiche.  When a fingerprint check revealed that he was a deported alien, a federal warrant for his arrest was obtained, and he was interviewed by an agent of the Bureau of Immigration and Customs Enforcement ("ICE").  Aly advised the ICE agent that he had re-entered the United States on November 23, 2005, by stealing his brother's passport and green card.  (GX 7.)  He further informed the agent that he had known Domiche for two and a half years.  (Id.)

14.  Aly further advised that in 2001 he had paid a man named Mohammed Khalid $2000 to arrange a marriage to an American citizen, Sara Pitera, who received half of the money.  (Id.) Aly stated that he only lived with Pitera for two days, and that he paid her $150 per week for about a year so that she would attend the necessary immigration interviews.  (Id.)

15.  Aly was indicted on the present charges on April 4, 2006, and was taken into federal custody on April 21, 2006.  He entered a plea of guilty before Magistrate Judge Peck on May 10, 2006.  The plea was accepted by this Court on June 14, 2006.

**IV.**   **Aly's Representation by David Patton**

16.  David Patton, Esq., was appointed as counsel for Aly on his initial presentment before a federal magistrate on April 21, 2006.  Patton visited Aly in jail after his appointment. (11/13/06 Tr. 9.)  Patton provided Aly with the discovery materials disclosed by the Government, and discussed with him the possibility of going to trial and his possible defenses. (Id.)  Patton advised Aly that it was in his best interest to plead guilty because he did not have viable defenses.  (Id. 10.)

17.  From the outset, Aly was ambivalent about this advice.  Aly focused more on wanting to get out of jail and not wanting to return to Egypt.  (Id. 11-12.)  Patton felt, however, and advised Aly, that because Aly had made a lengthy statement to government agents essentially confessing to both the illegal re-entry and false statement charges, there was no "real chance of a defense at trial."  (Id. 12.)  Moreover, Patton had calculated the applicable sentencing guideline range and believed that because the range was zero to six months, Aly had an excellent chance of receiving a sentence of time served.  (Id. 23-24.)   Eventually, Aly agreed that he would plead guilty.  (Id. 12.)  The Court specifically rejects Aly's claim that Patton

engaged in any sort of coercion or improper pressure as lacking in credibility.  To the extent that

Aly's claims of experiencing pressure are not complete after-the-fact fabrications, as appears

likely to this Court, they arise simply from Patton's carrying out his professional responsibility

of strongly advising Aly of what in Patton's professional judgment was the most advisable

course of action in an impossible legal situation.

18.  On the day of the plea, Aly was in pain from kidney stones.  (Id. 12-13; 5/10/06 Tr.

4.)  However, Aly's physical difficulties did not interfere with his ability to understand the

proceedings before the Court, as he freely advised the Magistrate Judge.  (Id. 4-5.)[7]  Aly was

fully advised of, and fully understood, the nature and elements of charges against him, the

consequences of his plea (including the maximum possible punishment he could receive), and

the rights he was waiving by his plea (including his right to go to trial).  (Id. 5-12.)  The Court

finds, based on the transcript of the allocution and the testimony at the hearing on the present

---

[7] Patton testified that he believed that pain "played a very large role in his judgment and in [Aly's] decision-making," contributing to a decision "to try to get through this process as quickly as possible."  (11/13/06 Tr. 22.)  However, his medical condition was only one of "a few things that went into that," including "that he was at a zero to six [months] guideline range and so, . . . every day we delayed the process was an extra day in jail, presumably."  (Id.)  Although the Court fully credits the subjective honesty of Patton's testimony, and does not doubt that Aly was suffering from a painful condition, it rejects the assertion that Aly's decision-making was distorted by pain.  First, Patton's testimony is biased; as a loyal defense attorney, he is predisposed to accept his client's assertions and to interpret his client's behavior in the most favorable possible light.  Second, the transcript of the plea allocution gives no indication whatsoever that Aly was rushed or precipitate, or for that matter that he was in acute distress that interfered with his understanding and decision-making capacity.  He specifically denied any such interference, the transcript shows little or no sign of hesitant speech or distraction, and Judge Peck, who was alert to any indication of difficulty, had no misgivings on this score.  Third, Aly's ambivalence about pleading and his constant flip-flopping about whether to adhere to the plea or attempt to withdraw it continued after the kidney stones had passed.  The Court thus finds as a fact that Aly's decision to plead guilty was not in any significant way produced by his medical problems.

motion, that Aly freely and voluntarily proffered a plea of guilty because he knew he was guilty, and because he had been correctly advised that a prompt plea of guilty offered the best chance of a reduced sentence.

19.  Even on the day of the guilty plea, Aly expressed some "misgivings" to his attorney about the plea.  (11/13/06 Tr. 12.)  However, his ultimate conclusion was that he "just wanted to plead guilty to get the case over with."  (Id. 13.)  When Aly hesitated about whether to enter a plea, Judge Peck specifically emphasized to Aly that the choice of whether to plead guilty is his, and offered him the opportunity to adjourn the proceedings in order to reflect further on the choice, clearly stating that if he entered the guilty plea that action was "irrevocable" and that he should feel no pressure at all – the judge did not "want anyone to be twisting your arm," nor did he want Aly "to later come back to court and say somebody was twisting your arm, or was forcing you to make a fast decision, or was convincing you to do something you didn't really want to do."  (5/10/06 Tr. 13-14.)  In the face of this advice, Aly announced that he wanted to plead guilty, and reaffirmed that decision upon being given "one last chance" to take "more time to think about it."  (Id. 14.)

20.  By May 14, 2006, however, Aly's misgivings had returned, and Aly wrote a letter to Patton, advising him that he "would like to change the plea and go to trial," falsely stating that he "didn't understand the charge," and expressing the opinion that he was not guilty.  (GX 5.)  It is not clear when this communication reached Patton, but it certainly reached him within a month, before the Court accepted the proffered plea on June 14 and before the June 16 sentencing date. (11/13/06 Tr. 14-15.)

21.  Patton candidly acknowledged that he did not consider, in reacting to Aly's communication, that it might be important to act before the Court formally accepted the plea. (Id. 16.)  Recognizing that clients often have misgivings or second thoughts after entering a plea, Patton's "first instinct" upon receiving such a communication "is not to run to the Court and express that desire to the Court but to speak with the client to find out what is going on." (Id. 16-17.)  Accordingly, Patton undertook to speak to Aly about the letter.  (Id. 17.)

22.  At some point between receiving the letter and the scheduled sentencing date, Patton did discuss the matter with Aly.  (Id. 19.)  He heard Aly's renewed discussion of his defenses, essentially that he had applied for a green card through his wife and had been unfairly denied a hearing on that application.  (Id.)  Patton was aware of the standard for challenging a deportation order in an illegal reentry case, and knew that because Aly had not exhausted his administrative challenges to the deportation order and had not been denied an opportunity for judicial review, he would not be able to prevail on the projected "defenses."  (Id. 20.)  It was based on that analysis that he had not filed a motion to dismiss the charge in the first place.  (Id. 17-19.) Following this conversation, Aly "decided to not withdraw his plea."  (Id. 17.)

23.  The next time that Aly indicated that he wished to withdraw his guilty plea was "[s]hortly before we actually came in for what was scheduled for that initial sentencing" on June 16, 2006.  (Id. 19.)  Aly asserted that "he didn't want to go back to Egypt, he had made . . . his initial decision to plead guilty in haste because he was in pain and he had these medical problems[, and] he wanted to take a shot at trial because he really didn't want to go back to Egypt."  (Id.)

24.  Patton told Aly that while he believed this decision was a mistake because he did not think any defenses would prevail, "it is your decision and I will go in and ask of the Judge that he give us a trial date."  (Id. 20.)  And that is just what Patton did.  (6/16/06 Tr. 2.)  The Court gave defendant two weeks to file a motion to that effect.  (Id. 4.)  No motion was filed, however.  Instead, defense counsel advised the Court that Aly "had changed his mind again and was prepared to proceed to sentence and did not wish to move to withdraw his plea."  (7/5/06 Tr. 2.)  Accordingly, sentencing was rescheduled for July 5, 2006.

25.  On July 5, however, Aly indicated that he had had another change of heart.  Defense counsel advised the Court that although Aly had "decided at some point last week that he did not want to file a motion to rescind his plea and wanted to simply go forward with the sentencing," immediately before the scheduled sentencing Aly advised that he again would like to rescind his plea, and furthermore that he wanted a new lawyer.  (Id. 3.)  The Court relieved Patton and appointed new counsel.  The remaining procedural history of the case is set forth above in Parts III and IV of the "Background" portion of this Opinion.

## CONCLUSIONS OF LAW

Rule 11(d)(2)(B), Fed. R. Crim. P., requires that a defendant show a "fair and just reason" in order to withdraw a guilty plea prior to sentencing.  The defendant bears the burden of demonstrating sufficient grounds for such relief.  United States v. Avellino, 136 F.3d 249, 261 (2d Cir. 1998).  This standard applies to the instant motion, which was filed after Aly's plea was accepted by the Court.

In determining whether there is such a "fair and just reason," a district court may consider such factors as whether there has been an assertion of legal innocence, the amount of

time that has elapsed between the plea and the motion, whether the government would be prejudiced by the withdrawal, and whether the plea was knowing and voluntary.  United States v. Schmidt, 373 F.3d 100, 102-03 (2d Cir. 2004).

Here, these factors strongly favor denial of the motion.  Although Aly loudly professes his innocence, there is no colorable defense and no plausible claim that he is not guilty of the charges against him.  Regardless of his quibbles over the different "A" numbers or over purported inaccuracies in the notice of deportation proceedings, Aly concedes that he is not a citizen, and that he is the same person who was ordered removed from the United States, and who was so removed, in 2005.  He obviously cannot deny that he has now returned to this country and been found here by the authorities.  He does not claim that he sought or obtained the permission of the relevant government officials to return.  To the extent that he claims that he was unfairly treated in the immigration process, that claim provides no defense.  Putting to one side the fact that Aly has admitted on several occasions that the marriage on which his green card application was based was a fraud, the green card application has no bearing on the present case.  It is unclear whether any procedural mistake in processing the green card application would have constituted a defense to the removal proceedings, given that Aly unquestionably lacked any legal status at the time of his removal hearing.  But even if some defense might have been argued in the removal proceedings, the validity of the deportation order may only be challenged collaterally as a defense to a criminal charge of legal reentry where the three conditions set forth in 8 U.S.C. § 1326(d) have been met: that is, where the defendant has exhausted his administrative remedies, where the deportation proceeding improperly deprived him of the opportunity for judicial review, and where the entry of the order was fundamentally

unfair.  See also Mendoza-Lopez, 481 U.S. at 837-42.

These factors have not been shown here.  Far from exhausting his administrative remedies and being unfairly deprived of a contemporaneous opportunity for judicial review of his deportation hearing, the record here unequivocally shows that Aly deliberately and knowingly, and with the advice of counsel, waived his administrative and judicial appeals and sought immediate removal, after the Immigration Judge took every opportunity to protect his rights to appeal.  There is thus no conceivable defense to the reentry charge, and no colorable claim of innocence.[8]

Moreover, Aly's original guilty plea was knowing and intelligent.  Judge Peck, who presided over the allocution, was "satisfied that [Aly] underst[oo]d the nature of the charges [and] the consequences of pleading guilty," concluded that Aly's "plea [was] made freely, voluntarily, and knowingly," and recommended that this Court "accept [the] plea of guilty." (5/10/06 Tr. 16-17.)  After a full hearing, based on the detailed factual findings above, this Court adheres to its original conclusion, on reviewing the transcript, that Judge Peck was absolutely correct.

Finally, although Aly had "misgivings" both before and after the plea, and made gestures towards withdrawing the plea within days of entering it, he repeatedly flip-flopped on the matter, and did not finally determine to seek to withdraw the plea until the eve of the adjourned

---

[8] Aly makes only the vaguest and most incredible efforts to challenge his guilt on the false statement charge.  His initial withdrawal motion did not even mention any claim of innocence on that charge, and now that that oversight has been called to his attention, he offers only the fanciful claim, in the face of overwhelming evidence, not only that he was legitimately married to Sara Pitera, but that – despite his contrary assertion at his removal hearing – he continued to live with her at the time of his 2005 statement to immigration agents, and that his many contrary statements were the product of confusion or coercion.  (11/9/06 Tr. 27, 51.)

sentencing date.[9]  Thus, the timing of the motion does not favor withdrawal.  The only factor that does favor defendant is the lack of prejudice to the government, but the law is clear that such prejudice is not required for denial of a motion to withdraw a plea.  United States v. Rosen, 409 F.3d 535, 546 (2d Cir. 2005).

Aly's principal contention at this stage of the proceedings is that he was denied the effective assistance of counsel in connection with his plea.  This claim is wholly without merit. To succeed on a claim of ineffective assistance, a defendant must show both that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006), citing Strickland v. Washington, 466 U.S. 668, 688 (1984), and that he suffered "prejudice" as a result, in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id., citing Strickland, 466 U.S. at 694.  Aly can show neither.

A defendant is entitled to effective assistance of counsel in connection with the making of a guilty plea.  Hill v. Lockhart, 474 U.S. 52, 58-59 (1985).  Aly received such assistance. Patton reviewed the discovery materials, discussed the case and its potential defenses with Aly, analyzed the possible defenses, correctly concluded that the chances of conviction were overwhelming, analyzed the sentencing guidelines, recognized that Aly stood a good chance of receiving a sentence of time served, and advised Aly correctly that in light of the overwhelming likelihood of conviction, and the likelihood that every day that sentencing was delayed would add to the length of Aly's incarceration on the criminal charges, his best strategy was a prompt

_____

[9] The legal effect of Aly's May 14 letter to counsel is further addressed below, in connection with his claim of ineffective assistance of counsel.

guilty plea and an expedited sentencing.  Absolutely nothing in the record suggests that this

advice was flawed, or that Patton or any other lawyer could have responsibly given any other

advice.  Aly's claim that Patton coerced him into pleading is rejected as simply false as a matter

of fact.  At most, Patton did what a lawyer is supposed to do: advise his client, in strong terms if

necessary, of his best professional advice.  Patton applied no coercion other than a dose of

reality, and the able Magistrate Judge took every conceivable step to assure that no coercion had

occurred.

   Nor did Patton depart from reasonable professional standards – save arguably in one

respect that ultimately proved inconsequential – in connection with Aly's subsequent request to

withdraw his plea.  Patton's decision to speak further to his client before "run[ning] to the Court

[to] express that desire" to withdraw the plea (11/13/06 Tr. 17) was entirely sound.  Since Patton

knew that the plea was in Aly's best interests, and since he knew – as does every experienced

defense attorney – that clients often have second thoughts after entering a guilty plea (id. 16-17),

it would have been utterly reckless to file a motion to withdraw without further consultation.[10]

   It is arguable that under the particular circumstances here Patton should have acted more

expeditiously in consulting Aly.  Given Patton's lack of recollection and Aly's utter unreliability

as a witness, it is impossible to make a finding as to when Patton acted on Aly's request.

Because the case law makes the timing of a motion relevant to the inquiry into whether a "fair

and just reason" to withdraw a plea exists, counsel should always act promptly to consult a client

who indicates a wish to file a motion to withdraw.  But the necessity for expedition is enhanced

---

   [10] It also would have been impossible, since filing a proper motion would require the
filing of papers, almost certainly including a declaration by Aly himself, as to the reasons for the
withdrawal, which could not be prepared without further consultation.

where a defendant has allocuted before a magistrate judge.  As the government concedes, there is

significant authority that a defendant in this situation retains an absolute right to withdraw his

plea, for any reason or for no reason at all, until the district judge adopts the magistrate judge's

recommendation and accepts the plea.  See United States v. Lopez, 385 F.3d 245, 250 (2d Cir.

2004); see, e.g., United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).  The timing

of such acceptance is totally outside the control of the defendant, depending on the preparation

of a transcript and the transmittal of the transcript by the government to the Court.  If the client

ultimately decides to withdraw the plea, time is of the essence, since the standard for granting

withdrawal becomes significantly more adverse once the plea is accepted.[11]

As noted, however, there is no basis for a finding that Patton delayed unreasonably in

consulting his client.  Moreover, and dispositively, upon consultation Aly once again decided to

adhere to his plea and *not* to attempt to withdraw the plea.  Aly thus cannot argue that he was

prejudiced in any way by how quickly or slowly Patton responded to his message.  He cannot

argue that Patton should have sought withdrawal without further discussion with his client; *that*

would very likely have been a departure from reasonable standards of professional practice.

Whether his consultation with Aly, and Aly's decision not to withdraw his plea, came before the

Court accepted the plea or after, the fact is that Aly himself did not firmly decide to withdraw his

plea until after the Court had accepted it – and even then Aly was to change his mind twice more

before finally deciding to file a motion.  Whatever might have been the case had Patton waited a

few weeks (as there is no evidence he did), during which time the Court accepted the plea (as it

---

[11] Patton candidly admitted that he did not consider this factor in deciding how quickly to
respond to Aly's letter.  Defense counsel should take heed of this possibility in the future.

did not), and Aly had decided upon full consultation with counsel to seek to withdraw the plea

and thus faced a tougher legal standard for withdrawal than would have been the case had

counsel acted more quickly (which did not happen), on the actual facts of this case no

ineffectiveness has been shown.

Finally, it is important to note that ultimately no prejudice can be shown in any event.

Aly has now had two opportunities, with two different successor counsel, to present any defenses

that he would have made if the motion to withdraw the plea had been granted.  In connection

with the false statement charge, he has barely tried to articulate a defense.  In connection with

the re-entry charge which forms the heart of the case against him, he has now fully presented the

motion to dismiss – a matter of law for the Court – that would be the only possible defense to the

charge, the factual components of which Aly continues to concede.  That motion would be – has

been – denied as lacking merit.  Even if Aly had been able to show ineffective assistance and had

been accorded the opportunity to withdraw his plea, the only defense he has proffered would

then be rejected as a matter of law, and he would be left once again with no alternative but to

plead guilty.

In the end, Patton's advice has been fully vindicated.  Had Aly adhered to Patton's

strategy and been sentenced on June 16, he would almost certainly have received a sentence of

time served.  His criminal case would be at an end, and his immigration case would have

proceeded.  By his protracted litigation of the validity of his plea, he has succeeded in delaying

disposition of the criminal case for over seven more months, during all of which he has been

incarcerated.  Moreover, his sworn testimony in the case has raised significant questions as to

whether he should be denied credit for acceptance of responsibility and found to have obstructed

justice, factors which could significantly alter the guideline sentencing recommendation on which Patton had relied, and could therefore lead to still further incarceration.[12]

### CONCLUSION

The defendant's motion to withdraw his guilty plea is denied.

SO ORDERED.

Dated:  New York, New York
January 23, 2007

GERARD E. LYNCH
United States District Judge

---

[12] The Probation Department had calculated a total offense level of 8 and a criminal history category of I, for a guideline recommendation of 0-6 months.  Absent the reduction for acceptance of responsibility, which was awarded by the Probation Department, see U.S.S.G. § 3E1.1(a), and with an enhancement for obstruction of justice, see U.S.S.G. § 3C1.1, the offense level would rise to 12, and the guideline recommendation to 10-16 months.  Of course, the Court expresses no view as to whether these modifications to the guideline calculation would be appropriate, a matter that will presumably be addressed by the parties at the time of sentencing.